**SIERRA CLUB INC., Petitioner–Appellee,**

v.

**COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellant.**

No. 95–70112.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1996.

Decided June 20, 1996.

Gary R. Allen and Thomas J. Clark, Attorneys, Tax Division, United States Department of Justice, Washington, D.C., for appellant.

Robert L. Dietz and B. Holly Schadler, Perkins Coie, Washington, D.C., for appellee.

Before NORRIS and WIGGINS, Circuit Judges, and JONES, * District Judge.

WIGGINS, Circuit Judge:

Sierra Club, Inc., a tax-exempt organization under I.R.C. § 501(c)(4), must pay taxes on "unrelated business taxable income" ("UBTI") under I.R.C. §§ 511–13.[1] I.R.C. § 512(b)(2), however, excludes "all royalties" from UBTI, thus rendering the royalty income of a tax-exempt organization non-taxable. The Commissioner of Internal Revenue ("Commissioner") contends that the Tax Court erred in determining on summary judgment that Sierra Club's income from the rental of its mailing lists and from participation in an affinity credit card program constituted "royalties" and therefore was not taxable for the years 1985, 1986, and 1987. We have jurisdiction under 26 U.S.C. § 7482

and we AFFIRM in part, REVERSE in part, and REMAND.

## I.

The income Sierra Club received from the following two business arrangements is at the center of this dispute.

### A. *Mailing List Rentals*

In order to communicate with its members in furtherance of its exempt purpose, Sierra Club developed and maintained a list of its members, donors, and other supporters; it also maintained a list of its catalog purchasers. Sierra Club had exclusive ownership rights in these mailing lists, including the right to all net income derived from them. Sierra Club retained Triplex Marketing Corporation ("Triplex"), a computer service bureau, to maintain the lists and update the lists by adding new names and removing stale names from the lists. Sierra Club also inserted "seed names" in its mailing lists to protect against abuse and unauthorized use of the lists.

Moreover, like many organizations, Sierra Club raised funds by permitting other organizations to "rent" the names from its mailing lists for a fee. Sierra Club retained Names in the News ("Names") and Chilcutt Direct Marketing Corporation ("Chilcutt")—both list managers—to administer and oversee the external uses of its lists. Sierra Club set the rates for the rental of the lists (the names on the lists could only be used once per rental); it also retained the right to review requests to rent the lists and to approve the proposed mailing material and schedule for the mailing.

Names and Chilcutt promoted the rental of Sierra Club's lists through solicitations, personal sales calls, advertising and seminars. Those who wished to rent Sierra Club's lists placed a list order with Chilcutt or Names, which Chilcutt or Names forwarded to Sierra Club. Sierra Club in turn filled the list rental order through Triplex, who would perform services requested by the list renter such as

---

* Hon. Napoleon A. Jones, Jr., United States District Judge for the Southern District of California, sitting by designation.

1. All citations to the Internal Revenue Code and regulations are for the years at issue unless stated otherwise.

selecting names based on zip code, gender, or frequency of contribution. Triplex provided the membership list or catalog list on magnetic tape, cheshire labels, or pressure sensitive labels as instructed by the list renter. Triplex billed Names or Chilcutt for the performance of these services; Names or Chilcutt in turn billed the list renter for these costs.

Names and Chilcutt received a commission of ten percent of the base price of the list (the cost of renting the list excluding the Triplex service charges). Typically, the list broker arranging for the rental on behalf of the list user would also receive a commission of ten or twenty percent of the base list price. Sierra Club thus received payment for the rental of the list less the commissions for Names or Chilcutt, the list broker's commission and Triplex's service charges.

In the tax years 1985, 1986, and 1987, Sierra Club received $142,636, $317,579, and $452,042 respectively for the rental of its mailing lists.

### B. *Affinity Credit Card Program* [2]

On February 20, 1986, after intermittent discussions, Sierra Club entered into an agreement (the "Sierra Club Bankcard Agreement") with American Bankcard Services, Inc. ("ABS"). The parties agreed that ABS would offer Sierra Club members a "Sierra Club Visa and/or Mastercard" with the name of Sierra Club on the front of the card and its logo on the reverse side. Sierra Club "agree[d] to cooperate with ABS on a continuing basis in the solicitation and encouragement of SC members to utilize the Services provided by ABS."

In exchange, ABS agreed to pay Sierra Club a monthly fee, designated in the agreement as a "royalty fee," of one-half percent of the total cardholder sales volume provided that the fees received by ABS from the financial institution issuing the card were between one-half and one percent of total cardholder sales volume.[3] ABS was responsible for the development of promotional and solicitation materials for the card program, subject to Sierra Club's approval. ABS agreed to bear the cost of such materials; however, Sierra Club had the right to elect to pay for the production and mailing costs associated with the solicitations to its members, in which case Sierra Club would receive an increased payment. ABS also was required to maintain complete accounts for the program.

Moreover, ABS agreed to indemnify Sierra Club and its members from all liability arising out of participation in the affinity card program. Sierra Club agreed to indemnify ABS and its agents for all liability arising from Sierra Club's participation in the program to the extent that the liability was a result of gross or willful negligence. The agreement specifically states that it does not establish a partnership or agent/principal relationship between ABS and Sierra Club.

In addition, the Sierra Club Bankcard Agreement notes that ABS had entered into an agreement with Chase Lincoln First Bank ("Chase Lincoln") in which Chase Lincoln agreed "to issue bankcards for [Sierra Club]." [4] In the event Chase Lincoln ceased to be the issuer of Sierra Club bankcards, ABS would recommend additional financial institutions from which Sierra Club could select a successor to Chase Lincoln.

After entering into the Sierra Club Bankcard Agreement, on March 9, 1986, ABS assigned its right to solicit Sierra Club's members to Concept I, Inc. On March 26, 1986, Sierra Club and Chase Lincoln entered

---

2. An affinity credit card program is an arrangement by which an organization such as Sierra Club agrees that a credit card issuer may use the organization's name and logo to market an affinity credit card-*i.e.*, the Sierra Club Visa Card-in exchange for a small percentage of total amounts charged on the affinity card.

3. The payment Sierra Club received increased if ABS received a greater percentage of total cardholder sales as a fee from the financial institution issuing the card. Sierra Club also received additional payments for Sierra Club members' use of an 800 number travel service.

4. The agreement states that "[Sierra Club] has selected Chase Lincoln as the financial institution to be the issuer of Sierra Club bankcards under this Agreement." However, at the time the Sierra Club Bankcard Agreement was entered into, Chase Lincoln had not yet agreed to issue the affinity card.

into an agreement in which they agreed that if ABS failed to perform its duties under the Sierra Club Bankcard Agreement, Chase Lincoln would have the right to assume ABS's responsibilities. Sierra Club also agreed not to authorize the issuance of other affinity cards by any other bank during the terms of its agreement with ABS.

Further, in a March 28, 1986 agreement between Chase Lincoln and Concept I, Chase Lincoln agreed to issue the Sierra Club Visa; Concept I agreed to solicit Sierra Club members at least twice a year using names and addresses supplied by Sierra Club. The parties acknowledged that all promotional materials were to be approved by Sierra Club. "In consideration for the solicitation of Members to participate in the Card Program," Chase Lincoln agreed to pay Concept I one percent of the total retail purchase volume generated by the card program. In a separate agreement dated March 28, 1986 between ABS, Concept I, and Chase Lincoln, Chase Lincoln secured the right (but not the responsibility) to assume the rights and responsibilities of either ABS or Concept I in the event that either or both failed to perform its obligations under the Sierra Club Bankcard Agreement as well as under the March 7, 1986 agreement between Concept I and ABS. Finally, on July 7, 1986, Concept I reassigned its right to solicit Sierra Club members for the affinity card program to ABS.

ABS initially solicited Sierra Club members for the credit card program in letters dated June 15, 1986. The letters were written on Sierra Club's letterhead, contained Sierra Club's return address and were signed by Sierra Club's president.[5] The letters were mailed using Sierra Club's non-profit postage permit, although ABS stated that this was a "mistake" because "[i]t might have been better to have had the mailing delivered all at once rather than spread out over the entire month." ABS also placed advertisements in *Sierra* magazine, which ABS paid for at the standard commercial advertising

rate. Members sent their credit card applications to Chase Lincoln; inquiries about the program were directed to a toll free number answered by Chase Lincoln or ABS. Members who applied for the Sierra Club Premier VISA received a letter on joint Sierra Club and Chase Lincoln letterhead, signed by the Vice President of Chase Lincoln and the Executive Director of Sierra Club, thanking them and welcoming them to the program.[6]

After the tax years at issue, ABS was unable to persuade Chase Lincoln to continue to waive its annual fee of $30. ABS mailed rebate checks to cardholders, many of which were not honored. Sierra Club declared ABS in default under their agreement on October 26, 1987 and terminated the agreement in late 1987. Sierra Club subsequently reimbursed its members for the annual fee. Sierra Club and Chase Lincoln entered into a new agreement, under which Sierra Club agreed, *inter alia*, to endorse the card program and encourage participation by its members, to include program information in its new member mailings and to advertise in *Sierra* magazine at its own expense.

For the tax years 1986 and 1987, Sierra Club received $6,021 and $303,225 respectively from the credit card program.

### C. *Proceedings Before the Tax Court*

On February 11, 1991, the Commissioner issued a notice of deficiency to Sierra Club for the 1985, 1986, and 1987 tax years based upon a determination that the income from the above described activities was UBTI and thus was taxable. After paying the additional tax, Sierra Club filed a petition before the Tax Court on May 7, 1991, challenging the Commissioner's deficiency determination and alleging that the income at issue constituted royalties which were excludable from UBTI.

Sierra Club and the Commissioner filed cross-motions for partial summary judgment on the issue of whether the income from the

---

5. The letters stated in part:

> As a member of the Sierra Club, you are eligible to apply for a new member service—The Sierra Club Premier VISA card. There are important advantages to both you and the Sierra Club when you use this card.

6. This letter reads in part:

> Thank you for joining with the Sierra Club and Chase Lincoln First in this important new program. We hope you'll enjoy the benefits and savings provided with your new Sierra Club Premier VISA.

rental of mailing lists constituted royalties under I.R.C. § 512(b)(2) and therefore was excludable from UBTI. In a memorandum opinion dated May 10, 1993, the Tax Court held that the rental income from the mailing lists constituted royalties.[7] In reaching this decision, the court defined royalties as " 'payments for the use of intangible property rights' " and thus are not limited solely to passive income, relying upon *Disabled American Veterans v. Commissioner*, 94 T.C. 60, 70, 1990 WL 16338 (1990) (*"DAV II "*), *rev'd on other grounds*, 942 F.2d 309 (6th Cir. 1991).

The parties then filed cross-motions for summary judgment on the issue of whether the income from the affinity credit card program constituted royalties as well. In a second memorandum opinion dated August 24, 1994, the Tax Court held that the "consideration received by [Sierra Club] on account of its participation in the affinity credit card program was for the use of intangible property ( [Sierra Club's] name, logo, and mailing list)."

The court's reasoning was twofold. First, it held that access to Sierra Club's member lists was a "key component" of the Sierra Club/ABS agreement in light of (1) Sierra Club's obligation to cooperate with ABS, (2) the stated desire to make the credit card program available to Sierra Club members, (3) the fact that ABS could offer additional services to members, (4) the fact that in the event of default ABS could no longer communicate with members, and (5) the fact that Sierra Club provided ABS with its member lists.[8]

Second, the court held that the intention of the parties in entering into the agreement was to permit ABS to use Sierra Club's name and logo, relying on the fact that (1) the description of the credit card included the use of the Sierra Club logo, (2) in the event of ABS' default, it was required to cease immediately using Sierra Club's name and logo, (3) ABS was required to obtain Sierra Club's written consent prior to using its name or logo, and (4) Sierra Club maintained the right to advise and consent with regard to the marketing materials prepared by ABS.[9] Accordingly, the court concluded that the income derived from licensing Sierra Club's name and logo to ABS and granting ABS permission to use Sierra Club's mailing lists for solicitation was royalty income.

The Commissioner appeals both decisions of the Tax Court.

## II.

### A.

We review the Tax Court's grant of summary judgment *de novo*. *Dial v. C.I.R.*, 968 F.2d 898, 900 (9th Cir.1992); *see also Huff v. United States*, 10 F.3d 1440, 1443 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2706, 129 L.Ed.2d 834 (1994). "We review the record in the light most favorable to the [Commissioner] to determine whether there is a genuine issue of material fact and whether the [Tax Court] applied the substantive law correctly." *Huff*, 10 F.3d at 1443.

### B.

The crux of the parties' dispute is how to define "royalties" for the purpose of I.R.C. § 512(b)(2). A tax-exempt organization under I.R.C. § 501(c) must pay taxes at normal corporate rates on "unrelated business taxable income." I.R.C. § 511(a). UBTI is de-

---

**7.** The Tax Court also held that there was a disputed issue of fact concerning whether a portion of the rental fee should be considered sales income from the sale of the media on which the mailing lists were furnished. The parties settled this question.

**8.** The court noted that the contracts between Sierra Club, ABS, Concept I, and Chase Lincoln were controlling on the issue of whether the income from the credit card program was royalty income. The court stated that "on its face, the [Sierra Club Bankcard] agreement is simply an agreement for ABS to market certain services to

members and for petitioner to cooperate in that effort."

**9.** In so holding, the court rejected the Commissioner's arguments that (1) Sierra Club was a joint venturer with Chase Lincoln and/or ABS, (2) Sierra Club was a sole proprietor selling services (*i.e.*, marketing and endorsing the credit card) to ABS and/or Chase Lincoln or (3) ABS was Sierra Club's agent for the purpose of selling marketing and endorsement services to Chase Lincoln.

fined as "the gross income derived by any organization from any unrelated trade or business ... regularly carried on by it, less the deductions allowed ... both computed with the modifications provided in subsection (b)." I.R.C. § 512(a)(1).[10] Section 512(b)(2) provides that "[t]here shall be excluded all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income."[11]

"Royalties" as used in § 512(b)(2) is not further defined by statute or by regulation. *Texas Farm Bureau v. United States,* 53 F.3d 120, 123 (5th Cir.1995). Thus, we look to the "ordinary, everyday senses" of the word. *Commissioner v. Soliman,* 506 U.S. 168, 174, 113 S.Ct. 701, 705, 121 L.Ed.2d 634 (1993). *Webster's Ninth New Collegiate Dictionary* defines "royalty" in pertinent part as "a share of the product or profit reserved by the grantor esp. [sic] of an oil or mining lease ... a payment made to an author or composer for each copy of his work sold or to an inventor for each article sold under a patent." *Webster's Ninth New Collegiate Dictionary* 1028 (1984).

*Black's Law Dictionary* provides a more comprehensive definition of a royalty as

[c]ompensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the property or as an account per unit produced. A payment which is made to an author or composer by an assignee, licensee or copyright holder in respect of each copy of his work which is

sold, or to an inventor in respect of each article sold under the patent. Royalty is share of product or profit reserved by owner for permitting another to use the property.

*Black's Law Dictionary* 1330–31 (6th Ed.1979).

From the above, we can glean that "royalty" commonly refers to a payment made to the owner of property for permitting another to use the property. The payment is typically a percentage of profits or a specified sum per item sold; the property is typically either an intangible property right-such as a patent, trademark, or copyright-or a right relating to the development of natural resources.[12]

Revenue Ruling 81–178, relied upon by the parties, supports defining royalty as a payment which relates to the use of a property right. It states that "[p]ayments for the use of trademarks, trade names, service marks, or copyrights, whether or not payment is based on the use made of such property, are ordinarily classified as royalties for federal tax purposes." Rev. Rul. 81–178, 1981–2 C.B. 135; *see also Texas Farm Bureau,* 53 F.3d at 123 (relying upon Rev. Rul. 81–178 for the definition of royalties under § 512(b)); *Fraternal Order of Police, Ill. State Troopers, Lodge No. 41 v. Commissioner,* 833 F.2d 717, 723 (7th Cir.1987) ("Both parties agree that a royalty is a payment for the use of a right, such as a trademark, trade name, service mark or copyright...."). Thus, according to Revenue Ruling 81–178, by definition, "royalties do not include payments for personal services." Rev. Rul. 81–178, 1981–2 C.B. 135.

---

**10.** "Unrelated trade or business" is "any trade or business the conduct of which is not substantially related ... to the exercise or performance by such organization of its charitable, educational, or other purpose." I.R.C. § 513(a); *see also United States v. American College of Physicians,* 475 U.S. 834, 838–39, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986) (whether organization's advertising income is taxable depends upon whether the publication of paid advertising is a "trade or business," whether it is regularly carried on, and whether it is substantially related to the organization's tax-exempt purpose).

**11.** Section 512(b)(1) also provides for the exclusion of "all dividends, interest, payments with respect to securities, loans, ... amounts received

or accrued as consideration for entering into agreements to make loans, and annuities and all deductions directly connected with such income." I.R.C. § 512(b)(1). Further, according to the Treasury Regulations, the assessment of whether income falls within one of the modifications in § 512(b) must be determined from all of the facts and circumstances of each case. 26 C.F.R. § 1.512(b)–1.

**12.** Thus, "royalty" is differentiated from "rent" by the nature of the property the owner is permitting another to use. *See id.* at 1297 (defining "rent" as "compensation or fee paid, usually periodically, for the use of any property, land, buildings, equipment, etc.").

The parties agree that the above definition of royalty is correct—up to this point. The Commissioner argues that "royalty" must be further defined, claiming that a payment for the use of intangible property is not necessarily a royalty *unless* the subject of the payment is "passive in nature." Sierra Club, on the other hand, contends that any payment for the use of an intangible property right constitutes a royalty. For the following reasons, we hold that under § 512(b)(2) "royalties" are payments for the right to use intangible property. We further hold that a royalty is by definition "passive" and thus cannot include compensation for services rendered by the owner of the property.[13]

First, the circuits that have considered whether or not income received by a tax-exempt organization constitutes royalties under § 512(b)(2) have consistently excluded income received as compensation for services-income that is not "passive"—from royalty income. In *Disabled American Veterans v. United States*, 227 Ct.Cl. 474, 650 F.2d 1178 (1981) ("*DAV I*"), the Court of Claims upheld the Tax Court's determination that DAV's income from the rental of its donor lists to other organizations was not royalty income under § 512(b)(2). *Id.* at 1189. The

court reasoned that § 512(b) as a whole "excludes from taxation the conventional type of passive investment income traditionally earned by exempt organizations (dividends, interest, annuities, real property rents)." *Id.* Because DAV's rental of its donor lists was "the product of extensive business activity by DAV" (such as preparing rate cards, sending the rate cards to list brokers, sorting the lists, and providing the information on magnetic tape or labels), the court held that the list rental income did "not fit within the types of 'passive' income set forth in section 512(b)." *Id.*[14]

Similarly, in *Fraternal Order of Police*, the Seventh Circuit held that income from the sale of space for business listings in *The Trooper* magazine was not royalty income excludable from UBTI under § 512(b)(2). 833 F.2d at 723–24. The court noted that the Fraternal Order of Police ("FOP") had the final authority over the editorial content of each issue of *The Trooper,* could appoint the magazine's executive editor, could prepare the editorials and feature articles, could oversee and control the solicitor's activities in the business listings program, could control the program's bank account and the reprint of any material published in *The Trooper,* and shared the proceeds of the business listings

---

**13.** Sierra Club argues that we should not consider the Commissioner's argument that royalties must be passively obtained because it was not raised below. In opposing Sierra Club's motion for partial summary judgment regarding the mailing lists, the Commissioner conceded before the Tax Court that "[t]he 'activity' or 'passivity' of a taxpayer vis-a-vis its income-producing activities is not determinative of the issue of whether a particular item of income is the type which Congress intended to exempt from UBIT [sic]." Rather, the Commissioner argued that in order to be excluded from UBTI as a royalty, the income must be "investment income"—which the Commissioner argued is determined by resolving whether Sierra Club was involved in the direct conduct of business, whether it had an investment motive for the activity and whether the activity at issue was "investment income." Normally, we will not consider issues not raised below for the first time on appeal. *Parks Sch. of Business, Inc. v. Symington,* 51 F.3d 1480, 1488 (9th Cir.1995). However, where the issue is solely one of law, the district court fully addressed and ruled upon the issue, and where no prejudice results to the other party, the court may exercise its discretion to review the issue. *See Aronson v. Resolution Trust Corp.,* 38 F.3d

1110, 1113 (9th Cir.1994) (court would consider a legal basis for dismissal not raised by the defendant below, where issue was one of law, plaintiff had raised the issue below, and both parties had briefed the issue on appeal). Here, although the Commissioner did not advocate adopting a distinction between the active or passive nature of royalty income, both parties briefed the issue below in the event that the court chose to adopt such a test, and both parties have briefed the issue on appeal. Therefore, we exercise our discretion to consider the issue.

**14.** This analysis was confirmed by the Sixth Circuit in *Disabled American Veterans v. Commissioner,* 942 F.2d 309 (6th Cir.1991) (*DAV III*). In *DAV III*, the Sixth Circuit reversed the Tax Court's holding that DAV's rental income from its donor lists constituted "royalties" under the recently issued Revenue Ruling 81–178. Although different tax years were involved, the court held that collateral estoppel barred DAV from relitigating the issue of whether the rental income constituted royalty income because Rev. Rul. 81–178 did not offer additional guidance on the issue of whether royalty income must be passive. *Id.* at 312–16.

program with the organization that published the magazine. *Id.* at 723. Thus, the court upheld the Tax Court's finding that FOP "was an active participant in the publication of *The Trooper*" and therefore the income received from the business listings program was not passive in nature and, consequently, not royalty income under § 512(b)(2). *Id.*

Most recently, in *Texas Farm Bureau,* the Fifth Circuit held that income received by the Farm Bureau from its agreement with two life insurance companies to help promote the insurance companies' life insurance plans was not royalty income. 53 F.3d at 123–24. The agreements at issue demonstrated that the Farm Bureau was paid in exchange for (1) granting the insurance companies the exclusive right to use the Farm Bureau name and logo in Texas, (2) agreeing to "use its good offices, influence, and prestige in promoting the general welfare" of the insurance companies, and (3) providing clerical, telephone and administrative services. *Id.* Accordingly, the court concluded that, as a matter of law, "the plain language of the agreements demonstrates that the agreements were strictly for services and did not contemplate a royalty payment." *Id.* at 124.

This distinction between payments for services and payments for the right to use an intangible property right is supported by Rev. Rul. 81–178. The ruling discusses and applies the exclusion of royalty income from UBTI in two factual scenarios. In the first, a tax-exempt organization of professional athletes solicits and negotiates licensing agreements which authorize the use of the organization's trademarks, trade names, service marks, as well as its members' names, photographs, likenesses and facsimile signatures; under the terms of the agreements,

the organization has the right to approve the quality and style of the use of the licensed product. In the second, the same organization solicits and negotiates agreements to endorse the products and services offered by the other party to the agreement; the agreements require personal appearances by the members of the organization. The ruling states that the income generated by the agreements in the first situation is royalty income within the meaning of § 512(b).[15] However, the income received in the second situation is not royalty income because the agreements "require the personal services of the organization's members in connection with the endorsed products and services." Rev. Rul. 81–178, 1981–2 C.B. 135.

Lastly, differentiating between passive royalty income and income which is compensation for services comports with the purpose of I.R.C. §§ 511–513. As discussed by the Commissioner, the imposition of the tax on unrelated business income was in response to a concern that tax-exempt organizations were competing unfairly with taxable businesses. *See United States v. American Bar Endowment,* 477 U.S. 105, 114, 106 S.Ct. 2426, 2432, 91 L.Ed.2d 89 (1986) ("The undisputed purpose of the unrelated business income tax was to prevent tax-exempt organizations from competing unfairly with businesses whose earnings are taxed."). Certain categories of income, however, were excluded from UBTI because "[the] committee believe[d] that they are 'passive' in character and are not likely to result in serious competition for taxable businesses having similar income." S.Rep. No. 2375, 81st Cong., 2d Sess., 28, 30–31 (1950), *reprinted in* 1950 U.S.S.C.A.N. 3053, 3083.[16] The purpose of the tax on

---

**15.** It notes that "the fact that the organization has the right to approve the quality or style of the licensed products and services does not change this result. The mere retention of quality control rights by a licensor in a licensing agreement situation does not cause payments to the licensor under the agreements to lose their characterization as royalties." Rev. Rul. 81–178, 1981–2 C.B. 135.

**16.** H.R.Rep. No. 2319, 81st Cong., 2d Sess., 36, 38 (1950), also states:

The tax applied to unrelated business income does not apply to dividends, interest, royalties (including, of course, overriding royalties), rents (other than certain rents on property acquired with borrowed funds), and gains from sales of leased property. Your committee believes that such "passive" income should not be taxed where it is used for exempt purposes because investments producing incomes of these types have long been recognized as proper for educational and charitable organizations.

*See also Portland Golf Club v. Commissioner,* 497 U.S. 154, 162, 110 S.Ct. 2780, 2786, 111 L.Ed.2d 126 (1990) (stating in dicta that "[s]ince Congress concluded that investors reaping tax-ex-

UBTI to prevent unfair competition coupled with the exclusion of income believed to be "passive" in character from that tax provides additional support for excluding payment for services from royalty income.[17]

■ Sierra Club's argument against "narrowly" interpreting the definition of royalties in § 512(b)(2) is threefold. First, Sierra Club argues that the IRS has previously rejected a "passivity test" in its own rulings. IRS internal memoranda, however, are not binding on the IRS or on this court. *See DAV III*, 942 F.2d at 315 n. 5 ("Such informal, unpublished opinions of attorneys within the IRS are of no precedential value."). Second, Sierra Club, in arguing that Congress intended to exclude *all* royalty income from UBTI, not simply royalty income passively derived, points to legislative history that states:

> All dividends, interest, annuities, and royalties, and the deductions directly connected therewith, are excluded from the concept of unrelated business net income. This exception applies not only to investment income, but also to such items as

business interest on overdue open accounts receivable.

S.Rep. No. 2375, 81st Cong., 2d Sess. at 108, *reprinted in* 1950 U.S.S.C.A.N. at 3166. We agree with Sierra Club that the legislative history, as well as the language of the statute, indicates that Congress intended to exclude "all royalties." Acknowledging this, however, does not aid in determining whether by definition "all royalties" *means* payments (for the use of a property right) that are passive in nature.

Third, Sierra Club claims that in order for the exception to UBTI to apply, the royalty income must be derived from an unrelated business activity, or it would not be taxable as UBTI in the first place. Thus, if the exclusion of royalties from UBTI were only meant to encompass passively derived royalties, § 512(b)(2) would never apply. In other words, because a trade or business is defined to *exclude* passive activities, *see American Bar Endowment*, 477 U.S. at 110, 106 S.Ct. at 2429 ("Congress defined 'trade or business' as 'any activity which is carried on for the production of income from the sale of goods or the performance of services.'")

empt income from passive sources would not be in competition with commercial businesses, it excluded from tax the investment income realized by exempt organizations").

**17.** The concurrence in *DAV III* relied upon Congress' 1986 amendment to I.R.C. § 513 to support its argument that § 512(b)(2) excludes income from mailing lists from the definition of "royalties." 942 F.2d at 317. Section 513(h) added in 1986 specifically excludes from UBTI payments to an exempt organization from another exempt organization for list rentals. I.R.C. § 513(h) (1995). The House Conference Report indicates that the amendment was in response to the Court of Claims ruling in *DAV I. See* H.R. Conf. Rep. No. 841, 99th Cong., 2d Sess., pt. 2 at 822 (1986), *reprinted in* 1986 U.S.S.C.A.N. 4075, 4910. In describing the present law, the report states:

> The U.S. Court of Claims has held that income received by the Disabled American Veterans from other exempt organizations and from commercial businesses for the use of its mailing lists constitutes unrelated business taxable income, and does not constitute royalties exempted from the UBIT [sic] under section 512(b)(2). The court found that the DAV operated in a competitive, commercial manner with respect to taxable firms in the direct mail industry; that the organization regularly carried on the mailing list activities; and that

these activities were not substantially related to accomplishment of exempt purposes.

*Id.* The report then describes the bill as providing "an exception from the UBIT [sic] ... for income from the exchanging or renting of membership or donor mailing lists with or to other such tax-exempt organizations." *Id.*

Although § 513(h)(B) was added in response to *DAV I*, Sierra Club is correct in noting that the report does not endorse *DAV I*'s definition of "royalties" nor its holding that the mailing list rental income was properly considered not to be royalties. Moreover, Sierra Club points to legislative history of the amendment which states that "no inference is intended as to whether or not revenues from mailing list activities other than those described in the provision [§ 513(h)(B)], or from mailing list activities described in the provision but occurring prior to the effective date, constitute unrelated business income." Staff of the Join Comm. on Taxation, 100th Cong., 1st Sess., General Explanation of the Tax Reform Act of 1986 (*J. Comm. Print* 1325 (1987)). Thus, we do not rely upon this amendment to infer the legislative intent of Congress in originally enacting § 512(b)(2). *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 114, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) ("The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") (internal citations omitted).

(quoting I.R.C. § 513(c)), a tax-exempt organization must be engaged in an active trade or business before a royalty could possibly be taxed under § 511.

This last argument highlights why royalties should be defined as "passive" only to the extent that a royalty cannot be compensation for services. Sierra Club could be engaged in a trade or business such as manufacturing t-shirts. The income from selling the t-shirts would be taxable as UBTI. However, if Sierra Club copyrighted the designs on its t-shirts and then licensed the designs to a t-shirt manufacturer in exchange for a one percent royalty fee on gross sales, the royalty fees would be excluded from UBTI under § 512(b)(2).

Thus, to the extent the Commissioner claims that a tax-exempt organization can do *nothing* to acquire such fees (*e.g.*, providing a rate sheet listing the fee charged for use of each copyrighted design or retaining the right to approve how the design is used and marketed), the Commissioner is incorrect. However, to the extent that Sierra Club appears to argue that a "royalty" is any payment for the use of a property right-such as a copyright-regardless of any additional services that are performed in addition to the owner simply permitting another to use the right at issue, we disagree.

In sum, we hold that "royalties" in § 512(b) are defined as payments received for the right to use intangible property rights and that such definition does not include payments for services.

### III.

■ Given the above definition of royalties, we must now decide whether the district court erred in granting summary judgment on the issue of whether the payments received by Sierra Club for one-time rentals of its lists constitute "royalties" or payments for services performed by Sierra Club.

The facts upon which the Tax Court based its decision are as follows.[18] Sierra Club maintained its mailing lists in furtherance of its tax exempt function; it hired Triplex to perform the task of maintaining the lists on a computerized data base. It also contracted with Chilcutt and Names to administer the rental of the lists. Sierra Club set the rates for the list rentals and retained the right to approve the content and date of the mailings of a list user. Chilcutt and Names were paid a commission for its services that was taken from the fee that the list user paid for the rental. Chilcutt and Names forwarded orders for list rentals to Sierra Club, which in turn had Triplex fulfill those orders. Triplex invoiced Chilcutt and Names for services such as sorting and providing labels; these charges were ultimately billed to the list user.

On these facts, the Tax Court held that it was undisputed that the income Sierra Club received for the rental of the lists was compensation for the use of its unique property-the mailing lists. The Commissioner argues, however, that these facts are indistinguishable from those of *DAV I*, in which the Court of Claims held that DAV's list rental income were "the product of extensive business activity by DAV" and therefore were not royalties. *DAV I*, 650 F.2d at 1189. DAV performed the following services: it prepared rate cards, it sent the rate card to list brokers, it permitted list users to select by zip code, etc., and it provided the information on magnetic tape or labels. *Id.* at 1184.

Here, Sierra Club contracted with others to perform those services that the Court of Claims held constituted "extensive business activity" in *DAV I*. The government argues that it does not matter that Sierra Club paid others to perform services such as sorting by zip code and providing the names on labels-Sierra Club was still in the business of selling and marketing its mailing lists. Sierra Club, on the other hand, correctly points out that it did not participate in any of the business activities that could be considered providing services. It did not market its lists, sort the lists, provide the lists on labels, or provide any other service to the list users. Nor did it pay Triplex to perform these services.

---

**18.** As noted above, the parties stipulated to the facts regarding Triplex's role after the Tax Court rendered its decision.

Triplex billed Names and Chilcutt for these services, who in turn billed the list renter.

Moreover, Sierra Club did not pay Names and Chilcutt to market the lists; rather, Names and Chilcutt received a commission from each rental. Nonetheless, the Commissioner argues that this commission was deducted from the list rental fee, and therefore was the equivalent of Sierra Club paying Names and Chilcutt to provide marketing services. Accordingly, the Commissioner would have us hold that any active effort to market intangible property-such as the right to use the names on the mailing lists-converts what was a royalty into a non-royalty, because the payment is obtained by active rather than passive conduct.[19]

We find Sierra Club's position more persuasive. Sierra Club did not itself perform the services relating to the rental of mailing lists. Nor did it market the mailing lists. It did nothing more than collect a fee for the rental of its mailing lists. Thus, Sierra Club's activities with regard to the mailing list rentals were far less substantial than the activities other courts have found to prevent a claim that income was royalty income. *Cf. Texas Farm Bureau*, 53 F.3d at 124 (Farm Bureau provided offices, clerical help, supplies, and agreed to promote insurance companies' policies); *Fraternal Order of Police*, 833 F.2d at 723–24 (FOP was an active participant in the publication of the magazine because it could appoint the executive editor, prepare editorials and feature articles, oversee and control solicitations of business listings and control the bank account and reprint of articles). To hold otherwise would require us to hold that any activity on the part of the owner of intangible property to obtain a royalty, renders the payment for the use of that right UBTI and not a royalty.

We therefore affirm the Tax Court's grant of partial summary judgment on this issue because the income received by Sierra Club from the list rentals was royalty income and not payment for services.

## IV.

◼ We now address whether, given the definition of "royalties" discussed above, the district erred in granting summary judgment on the issue of whether the income from the affinity credit card program constituted "royalties." Because the Tax Court improperly resolved disputed factual issues in favor of Sierra Club, rather than viewing the evidence in the light most favorable to the Commissioner, we reverse the Tax Court's grant of partial summary judgment and remand to the Tax Court for findings of fact regarding whether Sierra Club's income from the affinity card program constituted royalties under § 512(b).

To begin, we note that the agreements between Sierra Club, ABS, Concept I, and Chase Lincoln provide a sufficient basis for reversing the grant of summary judgment in favor of Sierra Club. We agree with the Tax Court that the agreements were unclear regarding what the parties were contracting for-Sierra Club's services or the use of Sierra Club's logo, mailing lists, and name. However, the Tax Court resolved any disputes as to the interpretation of the agreements in favor of Sierra Club.

For example, the Sierra Club Bankcard Agreement states that Sierra Club "agrees to cooperate with ABS on a continuing basis in the solicitation and encouragement of [Sierra Club] members to utilize the Services provided by ABS." This clause would permit a factfinder to infer that Sierra Club agreed to perform endorsement services-not simply to license its name and logo and permit the use of its mailings lists, as the Tax Court concluded. Similarly, the Sierra Club Bankcard Agreement nowhere states that Sierra Club agreed to license its name and logo to ABS and yet the Tax Court concluded that such a licensing was intended by the parties.

The agreements aside, the Commissioner points to facts which the Tax Court could have interpreted as evidence that Sierra Club performed services for ABS, Chase Lin-

---

19. We also note that Names, Chilcutt, and Triplex paid taxes on their income derived from providing services in connection with the mailing list rentals. Thus, to the extent the Commission-

er is concerned with the unfair competition with other businesses providing mailing list services, such concern is unwarranted.

coln, and its members in connection with the credit card program. For example, ABS used Sierra Club's postal permit to send the initial solicitation materials to Sierra Club members. In determining that the use of the permit did not demonstrate that Sierra Club provided a service to ABS, the Tax Court relied upon ABS' explanation that the use of Sierra Club's permit was a mistake. However, ABS only characterized the use of the permit as a "mistake" because in using the permit the mailing had to be spread out through the entire month. However, a fact-finder could infer that Sierra Club permitted ABS to use the permit as part of its agreement to cooperate with the solicitation of its members.

As yet another example, the Commissioner points to Sierra Club's actions once ABS failed to perform under the agreement: Sierra Club reimbursed its members for ABS' dishonored checks, and subsequently assumed ABS' responsibilities. Although a factfinder could find that Sierra Club only did so to protect its members and its reputation, a factfinder also could infer that Sierra Club was providing its members with a service, in conjunction with ABS, and that once ABS defaulted, Sierra Club took over its duties.

In sum, the Tax Court failed to view the facts regarding the affinity credit card program in the light most favorable to the Commissioner. Therefore, we reverse the grant of partial summary judgment on the issue of whether the income generated by the affinity credit card program was royalty income and remand this issue for trial before the Tax Court. As a consequence, the Tax Court failed to recognize that there remain genuine issues of material fact as to whether the payments Sierra Club received in connection with the program were payments for services.

## V.

Therefore, we REVERSE the partial grant of summary judgment on the question of whether the income generated by the af-

finity credit card program constitutes "royalties" and is therefore non-taxable.