193 F.3d 1098 (9th Cir. 1999)
 OREGON STATE UNIVERSITY ALUMNI ASSOCIATION, INC., Petitioner-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellant.
ALUMNI ASSOCIATION OF THE UNIVERSITY OF OREGON, INC., Petitioner-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellant.
 No. 96-70565, No. 96-70593
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 11, 1997--Portland, Oregon
Filed October 4, 1999
 
 Steven W. Parks, Tax Division, United States Department of Justice, Washington, D.C., for the respondent-appellant.
 Phillip N. Jones (briefed and argued), Carolyn W. Miller (briefed), and Stephen
 J. Klarquist (briefed), Duffy, Kekel, Jones & Bernard, Portland, Oregon, for the Petitioners appellees.
 Appeals from a decision of the United States Tax Court; John O. Colvin, Tax Court Judge, Presiding. Tax Ct. No. 2133-94, Tax Ct. No. 2132-94
 Before: William C. Canby, Jr., Thomas G. Nelson, and Andrew J. Kleinfeld, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 This case involves the tax treatment of affinity credit card programs conducted by university alumni organizations.
 
 
 2
 Facts.
 
 
 3
 These two cases went to trial in the Tax Court on stipulated facts, which are substantially the same in both cases (the two schools' alumni associations conducted their affinity credit card programs together). Basically, the alumni associations raised money for their schools by letting a bank offer credit cards using their names. The credit card customers and vendors did business with the bank in the ordinary way, and the bank paid money to the alumni associations. The alumni associations did not do much work for the money, but they did a little. The question is whether they did little enough work for the money they received to be royalties, nontaxable because of their exempt status, or whether they did too much, so that the money was taxable as unrelated business income.
 
 
 4
 Because the cases were tried, and there are no challenges to the findings of fact, we take our facts from the findings. The bank went into the deal to get access to the alumni associations' mailing lists and to use the schools' names, seals, colors and logos on the promotional material and cards, in order to facilitate marketing of credit cards. The alumni associations sought to raise money for the schools without much work for their staffs, to stimulate alumni to think about their schools when they paid for things with their credit cards, and to provide low cost credit cards to alumni.
 
 
 5
 The agreement required the alumni associations to provide accurate mailing lists and to provide materials the bank could reproduce and distribute to alumni advertising the program at least once a year. The bank paid the alumni associations one percent of what members recruited through the program spent on their credit cards, plus between $4 and $7 for each new member and each annual renewal. The alumni associations provided the mailing lists on magnetic tape. They spent perhaps twelve hours a year of clerical staff time on matters relating to the cards, such as preparing the tapes for the bank. The alumni associations did a little more promotion than they were required to do, such as a few printings and mailings, for which the bank reimbursed most of their expense, and meetings with the bank by each association's executive director once a year for an hour or two. Occasionally the alumni associations would pass on information about an alumnus who called about some credit card problem.
 
 
 6
 For this very few hours work and negligible expense, Oregon State grossed $254,252 and $357,998 for the two tax years at issue, University of Oregon $223,566 and $305,296. But the taste of free money was tainted by demands by the IRS for taxes of $89,590 and $120,288 from Oregon State, $75,588 and $105,183 from University of Oregon. The alumni associations went to trial, and won. The Tax Court rejected the Commissioner's argument that the money was unrelated business income[1] and held that it was royalty income.[2] The Commissioner appeals.
 
 
 7
 Analysis.
 
 
 8
 Both alumni associations are tax exempt[3].Such charitable corporations are taxable on "unrelated business taxable income."[4] That term basically means income from a business regularly carried on, the conduct of which is not, except for the money it produces, substantially related to performance of the corporation's charitable purpose.[5] But the tax code expressly excludes "all royalties" from the definition of "unrelated business taxable income."[6]
 
 
 9
 The Commissioner argues that the money the alumni associations made from the affinity credit card program was unrelated business income, but the Tax Court held that it was royalties. On appeal, the Commissioner argues that the Tax Court misunderstood the statutory definition of royalties, and that the alumni associations did too much work for the money to be royalties. We review the Tax Court's factual findings regarding the services the alumni associations rendered to the bank for clear error.[7] We review its determinations of law de novo.[8]
 
 
 10
 The Tax Court stated that a "royalty is a payment to use valuable intangible property rights." The Commissioner argues that this definition is mistaken under our decision in Sierra Club, Inc. v. Commissioner.[9] The Commissioner urges us to read Sierra Club to exclude from royalty income any money received from the performance of services, and to treat money as received from services if the recipient performed any services to get it. The Commissioner has not argued for allocation -so much of the $1.1 million in revenue as unrelated business income allocated to the fifty hours or so of services the two associations spent during the two tax years, and the remainder as royalties. The Commissioner argues for all or nothing.
 
 
 11
 Although Sierra Club also involved an affinity credit card program, the Commissioner's argument that that case controls this one and compels reversal is mistaken. For one thing, Sierra Club reversed a summary judgment because there was a genuine issue of fact as to whether the payments the association received were for services. The agreements between the parties were unclear, and permitted a fact finder to conclude that the association was not simply licensing its name and mailing lists, but also agreeing to perform active endorsement services. The agreement stated that Sierra Club" `agrees to cooperate with ABS on a continuing basis in the solicitation and encouragement of [Sierra Club] members to utilize the Services provided by ABS.' "[10] By contrast, the case at bar went to trial, and the facts have been found. Therefore, there is no occasion to remand it for trial to resolve issues of fact as there was in Sierra Club.
 
 
 12
 Also, the Commissioner takes our words in Sierra Club, that royalties "cannot include compensation for services rendered,"[11] out of context. A court decides a case. It does not write a statute. In a case, words have to be read in the context of the issue being decided. We were there rejecting the association's all-or-nothing argument, that royalty income was excludible regardless of how actively it was generated by services. Sierra Club is consistent with how the Tax Court defined royalties. We held that royalties, for purposes of the exclusion from unrelated business income, are "payments received for the right to use intangible propertyrights and that such definition does not include payments for services."[12]
 
 
 13
 Because we are construing words in a statute, we have to read the statute as a means of accomplishing a purpose, not merely a collection of arbitrary commands whose meanings come solely from the dictionary. "We must examine the meaning of the words to see whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress."[13] Congress had a reason for making "unrelated business taxable income" of charities taxable, but excluding from tax their "royalties." The purpose of taxing charities' unrelated business taxable income was to end what Congress saw as abuse of the exemption, by charities "able to carry on full-fledged commercial enterprises in competition with corporations whose profits were fully taxable."[14] The most publicized case illustrating this perceived abuse was ownership of a macaroni company by a law school, in unfair competition with macaroni companies that had to pay income taxes.[15] Though we have found no clear authority for the purpose of the royalty exclusion, it is hard to think of a way that charities could unfairly compete with for-profit businesses with respect to royalties in the same way that they can in the sale of goods or services, such as the pasta business. But it is easy to see how a charity could compete with a mailing list or promotional services company, if the money a charity received was largely on account of its promotional services rather than the use of its name.
 
 
 14
 Viewed purposively, the royalty exclusion cannot be an all-or-nothing proposition. The Commissioner is no more right, that even a little bit of service taints all the royalties, than the nonprofit association was right in Sierra Club, that it does not matter how much of the money results from services rather than passive licensing of a name. In this case, the Commissioner has not sought allocation, so we have no occasion to consider whether allocation would be appropriate in this or other cases. The question comes down to whether the Tax Court could find, on the record before it, that what the bank was paying the alumni associations for was the good will associated with the schools' names, seals, colors and logos, or whether it was paying them for mailing list management and promotional services.
 
 
 15
 Once the question is put this way, it is plain that the Tax Court gave it the right answer. The Commissioner has not suggested, and could not with a straight face, that commercial mailing list and promotion services would have been paid over a million dollars by the bank for around fifty hours of mostly secretarial and clerical work that the two alumni associations did during the two years at issue pursuant to the contracts with the bank. Were the banks purchasing the secretarial and clerical services rather than use of the schools' names, they would be paying about $22,000 per hour.
 
 
 16
 The Tax Court concluded that the bank paid the alumni associations for the use of their property rights, not for their services. The credit cards used pictures, colors, words and seals to show the university affiliations. Unlike the exempt institution in Disabled American Veterans v. United States,[16] the alumni associations did not follow the usual practices of the direct mail industry in renting its mailing list, did not regularly rent the list out, and did not use thousands of hours of staff time to administerrentals. The Tax Court's findings, that the alumni associations' promotional activities pursuant to the agreement were de minimis, were well supported. They were not required to mail anything to their members, and merely approved what the bank mailed out in their name once a year. The alumni associations did one mailing during the years at issue, but the agreement did not require it and the bank paid for it separately from the royalties. The Tax Court found that the few telephone responses to members regarding the credit cards were "de minimis and were done to protect petitioner's goodwill with its members," a finding well supported in the record. The facts stipulated to and found show that the bank designed the program, promoted it, and maintained it, with de minimis effort from the schools. What little the schools did pursuant to the agreements was the minimal administrative work necessary to give their mailing lists to the bank, and to prevent the bank from promoting the cards in such a way as to sour the associations' relations with their alumni.
 
 
 17
 The Tax Court's findings of fact were not clearly erroneous, and its conclusion was supported by its findings. Its conclusion in this case is consistent with its decisions in a number of similar cases.[17] The money received from the affinity credit cards fell within the royalties exclusion from unrelated business income.
 
 
 18
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 26 U.S.C. S 511(a)(1).
 
 
 [2]
 26 U.S.C. S 512(b)(2).
 
 
 [3]
 26 U.S.C. S 501(c)(3).
 
 
 [4]
 26 U.S.C. S 511(a)(1).
 
 
 [5]
 26 U.S.C. S 513(a).
 
 
 [6]
 26 U.S.C. S 512(b)(2).
 
 
 [7]
 Young v. Commissioner, 923 F.2d 719, 720 (9th Cir. 1991); Vukasovich, Inc. v. Commissioner, 790 F.2d 1409, 1411 (9th Cir. 1986).
 
 
 [8]
 Condor Int'l, Inc. v. Commissioner, 78 F.3d 1355, 1358 (9th Cir. 1996).
 
 
 [9]
 Sierra Club, Inc. v. Commissioner, 86 F.3d 1526 (9th Cir. 1996).
 
 
 [10]
 Id. at 1536 (quoting the agreement).
 
 
 [11]
 Id. at 1532.
 
 
 [12]
 Id. at 1535.
 
 
 [13]
 Longview Fibre Co. v. Rasmussen , 980 F.2d 1307, 1311 (9th Cir. 1992).
 
 
 [14]
 United States v. American College of Physicians, 475 U.S. 834, 838 (1986).
 
 
 [15]
 United States v. American Bar Endowment, 477 U.S. 105, 120 (1986) (Stevens, J., dissenting) (citing C. F. Mueller Co. v. Commissioner, 190 F.2d 120 (3d Cir. 1951)).
 
 
 [16]
 Disabled American Veterans v. United States, 650 F.2d 1178 (Ct. Cl. 1981); Disabled American Veterans v. Commissioner, 942 F.2d 309 (6th Cir. 1991).
 
 
 [17]
 Mississippi State University Alumni, Inc. v. Commissioner of Internal Revenue, T.C.M. (RIA) 97, 397 (1997); Sierra Club, Inc. v. Commissioner of Internal Revenue, T.C.M. (RIA) 99,086 (1999); Common Cause v. Commissioner of Internal Revenue, 112 T.C. No. 23 (1999); Planned Parenthood Federation of America, Inc. v. Commissioner of Internal Revenue, T.C.M. (RIA) 99,206 (1999).