T.C. Memo. 2001-38

UNITED STATES TAX COURT

ARKANSAS STATE POLICE ASSOCIATION, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13425-98.                    Filed February 20, 2001.

<u>Gregory B. Graham</u>, for petitioner.

<u>William I. Miller</u>, for respondent.


MEMORANDUM OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes and additions to tax as
follows:

|  |  | Addition to Tax |
| Year | Deficiency | Sec. 6651(a) |
| 1993 | $60,004 | $15,001 |
| 1994 | 63,730 | 15,933 |
| 1995 | 71,158 | -- |
| 1996 | 80,289 | 20,072 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement of some issues, the issue for decision involves whether payments petitioner received in connection with advertising in a law-enforcement trade publication should be treated under section 512(b)(2) as royalty payments and excluded from petitioner's unrelated business taxable income.

## Background

This case was submitted fully stipulated under Rule 122, and the facts are not in dispute.

Petitioner constitutes a not-for-profit corporation, organized under the laws of Arkansas and recognized under section 501(c)(5) as generally exempt from Federal income tax.

Petitioner was formed for the purpose of, among other things, promoting impartial enforcement of law and order, increasing efficiency in the police profession, and cultivating a spirit of fraternity and mutual helpfulness among and between the Arkansas law enforcement community and the people of Arkansas.

During the years 1993 through 1996, under an agreement entitled "Royalties and Licensing Agreement" (the Agreement) between petitioner and Brent-Wyatt West (BWW), an Arizona

publishing company, three editions of The Arkansas Trooper (TAT), petitioner's official magazine, were produced each year. In preparation for publication of each edition of TAT, articles, photographs, letters, and publicity regarding Arkansas law enforcement activities were collected through an officer of petitioner, reviewed by the officer of petitioner, and submitted by the officer of petitioner to BWW.

Each edition of TAT also contained numerous advertisements from a wide variety of Arkansas businesses, all directed at petitioner's members. The advertisements were solicited from Arkansas businesses over the telephone by employees of BWW. The advertisements generally promoted Arkansas businesses and/or commended Arkansas law enforcement activities. BWW employees developed the presentations to be used in soliciting the advertisements, but the advertising presentations and the advertising copy were subject to review and approval by petitioner.

BWW designed the layout of each edition of TAT, printed copies of TAT, and distributed the copies free of charge to each member of petitioner, to advertisers who purchased advertisements in TAT at a cost of at least $100, and to each Arkansas State Legislator.

Each edition of TAT expressly stated that all "editorial contributions" (namely, articles, photographs, letters, and

publicity) from petitioner's members, from readers of TAT, and from others should be submitted to petitioner for review and submission to BWW, that no part of TAT could be reproduced without written permission from petitioner and from BWW, and that any problems with regard to the solicitation of advertisements should be directed to petitioner.

Under the Agreement, BWW was authorized to use petitioner's name and logo in connection with the publication of TAT and the solicitation of advertisements in TAT. The substantial proceeds received during the years in issue relating to the paid advertisements appearing in each edition of TAT were divided between petitioner and BWW as follows:

|  | Percentage |
|--|-----------|
| Petitioner | 27 |
| BWW | 73 |

In addition, under the Agreement between petitioner and BWW, BWW was required to pay petitioner an annual fee of $25,200.

Each edition of TAT generally contained a message from petitioner's president, articles regarding law enforcement activities and conferences, and anecdotal stories involving individual law enforcement officers. The text of a typical letter published in the Fall-1995 edition of TAT is set forth below:

> Dear Association Members:  Thank you for the
> contribution to the Pine Bluff Youth Council (PBYC)
> Awards Program.  The $400 check will enable us to
> acknowledge area high school students who would not
> ordinarily receive recognition.

The text of one of the many brief advertisements appearing in the Fall-1995 edition of TAT is set forth below:

> Standing behind the ASPA from... Pine Bluff Radiologists

Under the Agreement, BWW, as publisher, bore all costs associated with production of each edition of TAT.  Checks in payment of advertising in TAT were made to the order of petitioner and were deposited into a bank account controlled by BWW.  BWW was required to allow petitioner to review the records relating to the bank account into which the advertising proceeds were deposited.

As indicated, the written materials relating to TAT were subject to the approval of petitioner.  Prior to publication, an officer of petitioner reviewed draft copies of each edition of TAT.

An officer of petitioner also reviewed the language of promotional and advertising sales materials relating to petitioner.  Petitioner's officer, however, did not otherwise monitor BWW's employees in the solicitation of advertisements for TAT.

Petitioner maintained a membership list and made it available to BWW in connection with the distribution of TAT.

Under the Agreement, BWW was identified as an independent contractor, not as an employee of petitioner. If petitioner believed that either BWW or its employees "damaged, infringed, tarnished, or otherwise degraded" petitioner's name, petitioner could, at its discretion, terminate the Agreement and its relationship with BWW.

BWW was required to and did publish at least 2,250 copies of each edition of TAT. For the 4 years in issue, in connection with the publication of TAT, petitioner received from BWW a total of $876,697, consisting of the 4 annual $25,200 payments due from BWW and petitioner's share of the advertising proceeds relating to TAT.

For 1993 through 1996, petitioner timely filed Form 990, Return of Organization Exempt From Income Tax. Petitioner treated the above $876,697 as royalty income and excluded it from its unrelated business taxable income. For 1993, 1994, and 1996, petitioner did not file Form 990-T, Exempt Organization Business Income Tax Return.

## Discussion

Section 511(a) provides for the imposition of tax on a tax-exempt organization's unrelated business income. Section 512(b)(2), however, provides that "royalties" received from an

unrelated business are to be excluded from unrelated business taxable income.  The text of section 512(b)(2) provides as follows:

> There shall be excluded [from unrelated business taxable income] all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income.

Royalties reflect payment for the use of valuable intangible property rights, such as trademarks, trade names, and copyrights. See, e.g., Fraternal Order of Police v. Commissioner, 833 F.2d 717, 723 (7th Cir. 1987), affg. 87 T.C. 747 (1986); Rev. Rul. 81-178, 1981-2 C.B. 135, 136.

Royalties, however, do not include payment for personal services.  See Sierra Club, Inc. v. Commissioner, 86 F.3d 1526, 1532 (9th Cir. 1996), affg. T.C. Memo. 1993-199, and revg. in part on other grounds and remanding 103 T.C. 307 (1994); see also Mississippi State Univ. Alumni, Inc. v. Commissioner, T.C. Memo. 1997-397; Rev. Rul. 81-178, 1981-2 C.B. 135, 136.

De minimis personal participation in an unrelated business will not necessarily disqualify royalty treatment for payments received by a tax-exempt organization.  See Oregon State Univ. Alumni Association, Inc. v. Commissioner, T.C. Memo. 1996-34, affd. 193 F.3d 1098 (9th Cir. 1999).

The parties herein agree that the publication of TAT was not substantially related to petitioner's tax-exempt purpose, and (absent qualification of the payments petitioner received as royalties) petitioner concedes that the $876,697 received from BWW during the years in issue is to be treated as unrelated business taxable income.

Whether payments are to be treated as royalties is to be determined from all of the facts and circumstances of each case. See sec. 1.512(b)-1, Income Tax Regs.

In Fraternal Order of Police v. Commissioner, supra, a fraternal police organization contracted with a publishing company to publish its official magazine. The police organization could prepare editorials and articles for the magazine, and the police organization could control and had final authority over the editorial content, the sale of advertising, the reprinting of the magazine, and the bank account into which advertising sales proceeds were deposited, a percentage of which the organization received. The police organization also could appoint the magazine's executive editor.

This Court and the Court of Appeals for the Seventh Circuit concluded that the organization took an active role in the publication of the magazine and that the payments received from the publishing company did not qualify as excludable royalties under section 512(b)(2).

In State Police Association of Massachusetts v. Commissioner, 125 F.3d 1 (1st Cir. 1997), affg. T.C. Memo. 1996-407, a police organization contracted with various publishing companies for publication of a magazine in return for a share of advertising proceeds from the magazine. Largely because of the police organization's close supervision over and involvement in the content of the magazine and in the sale of advertising for the magazine, this Court and the Court of Appeals for the First Circuit concluded that the publishing companies acted as agent for the police organization and that the payments the police organization received from the publishing companies constituted unrelated business taxable income. See id. at 7.

Petitioner relies on Rev. Rul. 81-178, 1981-2 C.B. 135, in which a tax-exempt organization licensed other businesses to use the organization's trademarks, trade names, and other intangible property in the promotion and sale of the other businesses' products and services. The tax-exempt organization retained the right to approve the quality or style of the products or services sold by the businesses using its name. In the ruling, respondent concluded that the payments the tax-exempt organization received from the businesses would constitute royalty payments and that "the mere retention of quality control rights by a licensor in a licensing agreement situation does not cause payments to the licensor under the agreements to lose their characterization as

royalties." <u>Id.</u> at 136. In the ruling, however, respondent also stated that if members of a tax-exempt organization provide personal services in connection with the endorsement of the other businesses' products, the payments received by the tax-exempt organization would no longer qualify as royalties. See <u>id.</u>

Like the tax-exempt organizations in <u>Fraternal Order of Police v. Commissioner</u>, <u>supra</u>, and <u>State Police Association of Massachusetts v. Commissioner</u>, <u>supra</u>, petitioner herein significantly participated in and maintained control over significant aspects of the publication of TAT. Petitioner possessed authority over the editorial content of TAT, and petitioner received and reviewed the articles, photographs, letters, and publicity for each edition of TAT.

This case is dissimilar from the so-called affinity credit card cases and mailing list cases in which tax-exempt organizations license their names to be used in the sale or promotion of another business' unrelated products (e.g., a credit card company's credit) and in which it has been held that the fees received by the tax-exempt organization qualified as exempt royalty income. See <u>Sierra Club, Inc. v. Commissioner</u>, <u>supra</u>; <u>Common Cause v. Commissioner</u>, 112 T.C. 332 (1999); <u>Mississippi State Univ. Alumni, Inc. v. Commissioner</u>, <u>supra</u>; <u>Oregon State Univ. Alumni Association, Inc. v. Commissioner</u>, <u>supra</u>.

Petitioner's participation in the publication of its own official magazine was not passive or de minimis. TAT represented not the magazine of BWW but the magazine of petitioner through which petitioner promoted and actively sought not just to capitalize on the value of its name but to carry out its organizational purposes and objectives, which were stated in the Fall-1995 edition of TAT as follows:

> to more effectively communicate between members of this department so as to encourage collective input and participation in short-term and long range goals of the Arkansas State Police.

The $876,697 petitioner received from BWW as petitioner's share of TAT advertising proceeds does not reflect royalty income. The payments are to be treated as unrelated business taxable income.

When tax-exempt organizations such as petitioner receive income from an unrelated trade or business of $1,000 or more, they are required to file Form 990-T, Exempt Organization Business Income Tax Return. See sec. 1.6012-2(e), Income Tax Regs.

Section 6651(a)(1) provides for an addition to tax unless the failure to file required tax returns is due to reasonable cause and not due to willful neglect. The present case involves close questions of fact and law that have been extensively litigated. We do not sustain respondent's additions to tax.

To reflect the foregoing,

   <u>Decision will be entered</u>

<u>for respondent as to the</u>

<u>deficiency amounts and for</u>

<u>petitioner as to the additions</u>

<u>to tax</u>.