T.C. Memo. 1997-397

UNITED STATES TAX COURT

MISSISSIPPI STATE UNIVERSITY ALUMNI, INC.,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9043-95.                    Filed August 28, 1997.

<u>James K. Hasson, Jr.</u>, <u>John W. Bonds, Jr.</u>, and <u>Amanda B. Scott</u>, for petitioner.

<u>Lourdes Gonzalez De Mendoza</u> and <u>Charles P. Hanfman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax of $13,374 for the tax year

ending June 30, 1989, $20,059 for the tax year ending June 30, 1990, and $26,143 for the tax year ending June 30, 1991.

The issue for decision is whether petitioner's income from an affinity credit card program is a royalty excluded by section 512(b)(2) from the tax on unrelated business taxable income. We hold that it is.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioner and Mississippi State University

1. Petitioner

The State of Mississippi operates Mississippi State University (MSU) in the town of Mississippi State, Mississippi.

Petitioner's principal office was in Mississippi State, Mississippi, when it filed the petition in this case. Petitioner is MSU's alumni organization.

Petitioner informs alumni about MSU, solicits gifts from alumni and supporters, and organizes alumni chapters. Petitioner uses direct mail and telemarketing to raise funds for MSU. Petitioner requests contributions from MSU alumni and sends them Mississippi State Alumnus magazine (Alumnus) and information about homecoming, class reunions, and chapter events. Petitioner has about 100 chapters.

Petitioner keeps a mailing list of MSU alumni so MSU and petitioner can communicate with them.  Petitioner has kept these records on its computer since 1981.  During the years in issue, petitioner updated its alumni mailing list daily.

Petitioner reports to MSU's Office of University Relations, which is headed by MSU's vice president for advancement. Petitioner is exempt from Federal income tax under section 501(c)(3).

2.   Petitioner's Employees

Petitioner had about 12 to 14 full-time employees from 1988 to 1991.  Petitioner also employed students part time.  MSU generally paid petitioner's employees.

Steve C. Grafton (Grafton) was petitioner's executive director from September 1987 to July 1994.  He reported to MSU's vice president for advancement and to petitioner's board of directors.  He usually worked 50 to 60 hours a week during the years in issue.

Frances Carr (Carr) has worked for petitioner since around 1979.  She processed annual fund gifts, made address changes on the data base, and produced lists, labels, and diskettes during the years in issue.  Student employees assisted her during the years in issue.

Petitioner hired a marketing coordinator in 1990.  See paragraph F, below.

B.    Peoples Bank & Trust

Peoples Bank & Trust (PB&T), a bank the principal office of which is in Tupelo, Mississippi, was engaged in the credit card business, including issuing affinity credit cards.  An affinity credit card is a card designed for and marketed to members of a group or organization.  PB&T received finance charges, merchant fees, and interchange income from affinity credit cards it had issued.

In 1987, PB&T told petitioner it would like to issue affinity credit cards for petitioner.  Later in 1987, petitioner sent letters to several financial institutions, including PB&T, seeking proposals for an affinity credit card program.[1]  The letter detailed the major features petitioner wanted in any proposal.

Edwin Brown (Brown), a vice president of PB&T, answered petitioner's letter and represented PB&T in affinity credit card negotiations with petitioner.  PB&T wanted permission to use petitioner's mailing list, marks, and logos.

---

[1]Respondent contends that petitioner initiated the first contact with PB&T.  We have found otherwise on the basis of Grafton's and Edwin Brown's testimony.  Respondent adduced no evidence to the contrary.

C.    The 1987 Affinity Credit Card Agreement

On November 20, 1987, petitioner and PB&T agreed (1987 agreement) that PB&T would administer an affinity card program targeted to petitioner's members.

1.    Terms of the 1987 Agreement

The 1987 agreement was to be effective for 3 years. Thereafter, it would be automatically renewed for terms of 1 year, unless either party notified the other in writing at least 90 days before the end of the initial or current renewal term that it would not renew the agreement.

PB&T agreed to apply its customary credit policies to credit card applications from petitioner's members. Cardholder agreements between PB&T and the cardholders were to govern cards that PB&T issued.

PB&T offered the VISA Classic and MasterCard Red and Ochre under the 1987 agreement. PB&T agreed to charge each cardholder an annual fee of $9, to use an interest rate of 15.96 percent, and to consult with petitioner before raising the rate.

PB&T agreed to provide the following services at no cost to the cardholders:  $200,000 air/common carrier insurance, collision damage waiver on automobile rental, emergency cash service, and a travel service. PB&T agreed to offer credit life insurance, credit disability insurance, and unemployment insurance to cardholders at the cardholder's expense.

PB&T agreed to pay petitioner 45 cents for each cardholder transaction and $3 for each card membership and annual fee paid to PB&T. The 1987 agreement did not say whether the payments were intended to be royalties or business income.

PB&T agreed not to assess merchant discount charges or processing fees on purchases from petitioner by alumni and on gifts made to the MSU Annual Fund by cardholders if the transaction was charged to the affinity credit card. Petitioner received thousands of dollars of contributions through this arrangement.

PB&T agreed to give petitioner space for four lines with 60 characters up to six times a year on PB&T's monthly statements to cardholders without cost to petitioner or cardholders to promote alumni activities.

The 1987 agreement said that petitioner was not a partner of or joint venturer with PB&T and that petitioner did not agree to bear any loss PB&T might suffer in the affinity credit card program.

2. Endorsement and Promotional Materials

Petitioner agreed to state in a letter or other message that PB&T wrote and sent, and bearing petitioner's executive director's name or a facsimile of his signature, that PB&T was the exclusive provider of the affinity credit cards. PB&T agreed to prepare and pay for all endorsement and marketing material and

activities. PB&T agreed to submit to petitioner for advance approval each endorsement and related marketing material.

The 1987 agreement did not require petitioner to keep copies of credit card applications or provide them to alumni.

3. License To Use Intangible Property

The 1987 agreement gave PB&T the exclusive right to use petitioner's name on the affinity credit cards and in related marketing materials.

MSU gave PB&T permission to use MSU's registered trademark, the "walking bulldog", on the affinity credit cards and related marketing material. MSU did not charge petitioner or PB&T for PB&T's use of the MSU trademark because MSU wanted petitioner to receive all of the payments from PB&T for the affinity credit card program. Petitioner agreed to use its best efforts to keep MSU's permission to use the trademark.

4. Membership Lists and Updates

PB&T agreed that all membership lists petitioner provided were to remain petitioner's property and confidential. PB&T agreed to use petitioner's mailing lists only for the affinity credit card unless PB&T had petitioner's written consent to use them for other purposes. PB&T agreed to give address changes it received from cardholders to petitioner monthly at no charge.

D.   Performance Under the 1987 Agreement

　　1.   Establishing Affinity Credit Card Accounts

　　PB&T processed applications, established and loaded accounts on its computer system, produced credit cards, accepted and posted transactions, generated statements, and processed payments.  Petitioner did none of this work.

　　2.   Endorsements, Solicitations, and Promotions

　　PB&T drafted and sent letters to promote the affinity credit cards to petitioner's members in March or April 1988.  In April 1989, PB&T drafted and sent letters endorsing the affinity credit card to parents of MSU students.  That letter stated that petitioner offered the credit cards in cooperation with PB&T and urged parents to apply for cards for their students.  Each letter was printed on petitioner's letterhead and had a facsimile of Grafton's signature.

　　PB&T developed solicitation materials during the years in issue.  Grafton reviewed these materials for accuracy, quality, style, and consistency with petitioner's position.  It took him 3 to 5 minutes to review an endorsement letter prepared by PB&T. He did not make changes to those letters.

　　At petitioner's suggestion, PB&T mailed promotional material to MSU's faculty and staff.  On June 2, 1988, petitioner billed PB&T $226.28 for 4,000 envelopes, $78.12 for 4,000 sheets of stationery, and $93.72 for 3,124 address labels for faculty and staff of MSU that petitioner provided to PB&T for this mailing.

3.  Mailing Lists and Updates

Petitioner gave PB&T copies of petitioner's list of the names and addresses of its members twice during the years in issue on 8½-inch computer diskettes.  The lists had about 55,000 names.  PB&T could not operate the diskettes and paid an outside company to convert them to a format it could use.

Carr made these copies of the mailing list diskettes for PB&T in less than 30 minutes.  To generate the two lists for PB&T, Carr used the computer program and the procedure that she used to generate similar lists for petitioner.

PB&T sent address changes for cardholders to petitioner about once a month.  Petitioner added the new addresses to its data base.

4.  Advertising by PB&T

Petitioner asked PB&T to advertise the credit cards in Alumnus and Affairs of State, a newsletter (not further described in the record).  Petitioner began to actively sell advertising for Alumnus in 1990.

PB&T prepared and paid for advertisements for the credit card program in Alumnus for the fall of 1988, fall of 1990, and spring and fall of 1991.

PB&T advertised the card in the student newspaper and sports programs.  During 1988 and 1989, PB&T bought advertising for the affinity credit card in MSU's football programs.  Once in conjunction with a football game during the years in issue, and

without petitioner's help, MSU let PB&T set up a table on MSU's campus to distribute credit card applications.

In the fall of 1988, PB&T paid a well-known MSU football sports announcer to endorse the affinity credit card. He was not an employee or agent of petitioner. PB&T used his photograph and signature in print advertisements it prepared.

PB&T produced radio advertisements and posters. PB&T hired students to insert affinity credit card applications in bags at the MSU bookstore.

5. Payments by PB&T

PB&T paid for data processing, marketing, and royalties related to the affinity credit card and paid mailing companies for services needed to market the credit card by direct mail. PB&T paid petitioner according to the terms of the agreement.

6. Petitioner's Activities

Petitioner did not mass mail any credit card applications or marketing materials. Petitioner did not ask PB&T to expedite any affinity credit card applications or to increase any person's credit limit. Petitioner did not process credit card applications or decide to whom to issue a card. Petitioner did not make any payments to PB&T.

PB&T gave credit card application forms to petitioner, which petitioner kept in its office to give to alumni on request. Petitioner mailed application forms to one or two alumni who

requested them. Petitioner also put application forms in the lobby of the MSU Alumni Center.

Petitioner's representatives took some application forms to local alumni chapter meetings and put a few of them on tables with notices, copies of Alumnus, fund solicitation information, and other materials about MSU and petitioner. If alumni requested information from petitioner, petitioner mailed materials to the alumni which probably included a credit card application.

Petitioner did not let PB&T representatives speak at alumni meetings about the affinity credit card program.

Grafton met with PB&T representatives at least once but fewer than four times during the years in issue to discuss the affinity credit card program and to hear PB&T's ideas for expanding the program.

From November 1987 to June 1991, petitioner gave messages to PB&T to print on the monthly credit card statements. The messages announced campus events such as homecoming and Super Bulldog Weekend.

MSU's Office of University Relations wrote an article about the affinity credit card in the fall 1988 edition of Alumnus.

E.  Petitioner's Sale of Merchandise With the MSU Seal

Generally, petitioner did not let anyone use its mailing list. However, petitioner contracted with Wayneco, a commercial company, for Wayneco to sell items bearing MSU's seal, such as

rings, watches, lamps, crystal clocks, grandfather clocks, and chairs, to MSU's alumni.[2]  Petitioner contracted with Wayneco for Wayneco to sell Seiko watches in 1988, lamps in 1989, and Waterford crystal clocks in 1991.  Petitioner had the right to review promotional materials that Wayneco prepared.  Petitioner agreed to:  (a) Sponsor Wayneco's offering of the items; (b) get MSU's approval to use MSU's seal on the items and related promotional material; (c) allow Wayneco to use facsimile signatures of an official of petitioner to promote the items; and (d) give Wayneco (i) mailing labels with names and addresses of all living alumni and parents of MSU undergraduates, (ii) samples of its letterhead and envelope for Wayneco to reproduce, (iii) copies of MSU's official seal, and (iv) a letter from an official of petitioner's on its letterhead stating that petitioner had chosen Wayneco to supply the items.  Wayneco agreed to pay petitioner $25 for each watch, $20 for each lamp, and $25 for each clock that Wayneco sold under the agreement with petitioner. The agreement states that the payments are royalties.  Petitioner compiled and sent mailing list labels to Wayneco.  Wayneco paid all other costs.

Political candidates and other vendors asked for permission to use petitioner's mailing list.  Petitioner denied all requests except Wayneco's and PB&T's during the years in issue.

---

[2]Income that petitioner received from the sale of this merchandise is not at issue in this case.

F.   Marketing Coordinator

   1.   Creation of the Position

On June 8, 1990 (the last month of the second of 3 years at issue), Grafton asked Dr. Billy C. Ward (Ward), MSU's vice president for advancement, for permission to hire a marketing coordinator for petitioner.  Grafton estimated that this person's work would produce enough funding to pay his or her own salary.

Grafton told Ward the marketing coordinator would generally assist petitioner's executive director and would develop an advertising program for petitioner's magazine; manage a new MSU art sale program; expand the affinity credit card program; coordinate the marketing program for merchandise-for-resale, such as watches, lamps, etc.; oversee petitioner's alumni travel program with outside travel companies; generate revenue for petitioner; and help to plan, coordinate, and especially to market petitioner's other activities including, but not limited to, homecoming, alumni trips, tent parties/open houses, the annual leadership conference, annual business meetings, the MSU staff summer party, class reunions, the annual alumni awards banquet, Black Alumni Day, Government Appreciation Day, the faculty awards program, the faculty/staff Christmas open house, and other alumni activities.  Ward authorized Grafton to hire a marketing coordinator.

2.  Hiring of Elizabeth "Libba" Andrews

Petitioner hired Elizabeth B. "Libba" Andrews (Andrews) as marketing coordinator in August 1990 (the second month of the final year in issue).  She spent most of her time from August 1990 to June 30, 1991, developing an advertising program for Alumnus.  During that time she also developed new alumni programs, participated in strategic planning, and helped manage petitioner.

Andrews spent a negligible amount of time as petitioner's contact person for the affinity credit card program.  Brown met with her once at petitioner's office and once at the bank.  They spoke on the phone around four times about the affinity credit card program and six times about the sale of advertising.

Andrews sold advertising in Alumnus to PB&T for the affinity credit card program on the same terms as applied to other advertisers.  She sent advertising contracts to Brown in February and June 1991.  Petitioner and PB&T signed the February 1991 contract.

Andrews suggested that the 1987 contract be changed to allow petitioner to include a larger message in the monthly billing statements.

Andrews answered some questions from alumni about the affinity credit card.  In April 1991, an alumnus complained to petitioner about the affinity credit card program.  Andrews

contacted Brown about the alumnus' complaint and wrote the alumnus a letter to maintain good will with him.

Andrews and some of the other supervisors shared several assistants who worked for petitioner. The record does not suggest that the assistants worked on the credit card program.

Grafton prepared budgets for petitioner with categories for various expenses. He had no budget category for the affinity credit card program. Petitioner paid Andrews $22,000 during her first year. She was petitioner's associate director at the time of trial.

## G.  1991 Agreement

Petitioner and PB&T signed a replacement affinity credit card agreement in February 1991 (1991 agreement). It made two changes to the 1987 agreement: (1) It provided a procedure for PB&T to transfer member accounts and receivables to another bank if petitioner or PB&T did not want to renew the agreement, and (2) it said the payments from PB&T to petitioner were royalties.

Andrews contacted several universities to seek ideas and suggestions relating to an addendum to the 1991 contract.

## H.  Sale of Olympic Coins

Universal Coins, a Canadian business, contacted PB&T to ask if PB&T would like to participate in an Olympic coin program. Universal Coins offered to pay PB&T to insert material promoting the Olympic coin program in credit card statements. On April 26, 1991, Brown wrote Andrews a letter in which he described the

Olympic coin program. PB&T offered to split commissions with petitioner for orders placed by petitioner's members. Neither PB&T nor petitioner received any money from Universal Coins under the Olympic coin program.

I.    Direct Mail & Computer Services Letter

In September 1991 (after the years in issue), Chuck Smith (Smith), president of Direct Mail & Computer Services, sent the following letter to petitioner:

> Gentlemen:
>
> I am in receipt of your request concerning name list rental rates during the period of 7/88-6-89. Rental rates for nonprofit institutions have remained static for several years, including the period in question, at $60.00/m names rented with a $5.00/m surcharge for sortation to the zip code level. This is essentially a universal price which is heavily documented throughout the list rental industry in such publications as Standard Rates and Data, etc.

J.    Petitioner's Federal Tax Returns

Petitioner timely filed Forms 990, Return of Organization Exempt from Income Tax, and Forms 990-T, Exempt Organization Business Income Tax Return, for the years in issue.

On its Forms 990 for the years in issue, petitioner reported that PB&T had paid it the following amounts of royalties: $74,703 for 1989, $105,797 for 1990, and $114,364 for 1991. Petitioner did not report these amounts as unrelated business taxable income on the Forms 990-T that it filed for those years. Petitioner reported that it had received $2,500 of advertising income for 1989, $2,500 for 1990, and none for 1991. On its

Forms 990-T for 1989, 1990, and 1991, petitioner reported taxable income from the sale of merchandise including rings and watches. Petitioner reported commission income on insurance on Forms 990-T for 1989 and 1990.

## OPINION

### A. Taxation of Unrelated Business Income and Royalties

Section 511(a)(1) imposes a tax on the unrelated business taxable income (UBTI) of certain tax-exempt organizations. Petitioner is subject to tax on its UBTI under section 511(a)(2) because it is tax exempt under section 501(c). As a general rule, income is UBTI if: (1) The income arises from a trade or business, (2) the trade or business is regularly carried on, and (3) the trade or business is not substantially related to the organization's tax-exempt purpose. Sec. 512(a)(1); Veterans of Foreign Wars v. Commissioner, 89 T.C. 7, 19-20 (1987).

Royalties are excluded from UBTI. Sec. 512(b)(2). Whether income is a royalty is decided on the basis of all the facts and circumstances. Texas Farm Bureau v. United States, 53 F.3d 120, 123 (5th Cir. 1995); sec. 1.512(b)-1, Income Tax Regs. The taxpayer bears the burden of proof. Rule 142(a).

A royalty is a payment for the right to use valuable intangible property rights; it is not a payment for services rendered by the owner of the property. Texas Farm Bureau v. United States, 53 F.3d at 123-124; Sierra Club, Inc. v. Commissioner, 86 F.3d 1526, 1531-1532 (9th Cir. 1996), affg. T.C.

Memo. 1993-199 and affg. in part and revg. in part on other grounds and remanding 103 T.C. 307 (1994);[3] Disabled Am. Veterans v. Commissioner, 94 T.C. 60, 70 (1990), revd. on other grounds 942 F.2d 309 (6th Cir. 1991).

The U.S. Court of Appeals for the Ninth Circuit discussed the degree of activity the recipient of a royalty under section 512(b) may conduct as follows:

> Thus, to the extent the Commissioner claims that a tax-exempt organization can do nothing to acquire such fees (e.g., providing a rate sheet listing the fee charged for use of each copyrighted design or retaining the right to approve how the design is used and marketed), the Commissioner is incorrect. However, to the extent that Sierra Club appears to argue that a "royalty" is any payment for the use of a property right--such as a copyright--regardless of any additional services that are performed in addition to the owner simply permitting another to use the right at issue, we disagree. [Sierra Club, Inc. v. Commissioner, supra at 1535.]

Thus, we must carefully review the actions by an organization to ensure that fees are paid for the use of intangible property and not for services. See Alumni Association of the Univ. of Or., Inc. v. Commissioner, T.C. Memo. 1996-63;

---

[3]In that case, the U.S. Court of Appeals for the Ninth Circuit reversed our grant of partial summary judgment and remanded the case for trial on the issue of whether the income generated by an affinity credit card program was a royalty because the Tax Court did not view facts regarding the program in the light most favorable to the Commissioner. Sierra Club, Inc. v. Commissioner, 86 F.3d 1526, 1537 (9th Cir. 1996), affg. T.C. Memo. 1993-199 and affg. in part and revg. in part on other grounds and remanding 103 T.C. 307 (1994).

Oregon State Univ. Alumni Association, Inc. v. Commissioner, T.C. Memo. 1996-34.

Respondent contends that petitioner's income from the affinity credit card program during the years in issue arises from a trade or business which petitioner regularly carried on and which is substantially unrelated to its tax-exempt purpose, and that petitioner's affinity credit card income is not a royalty under section 512(b)(2).[4] For reasons discussed below, we hold that the payments at issue are royalties. In light of this holding, we need not decide whether petitioner's affinity credit card program is a trade or business.

B.    Whether PB&T Paid Petitioner To Use Valuable Intangible Property Rights

PB&T obtained the right to use valuable intangible property rights in the 1987 and 1991 agreements. Under the agreements, PB&T could use petitioner's name, its letterhead, the signature of its executive director on promotional materials, a list of names and addresses of petitioner's members, and MSU's "walking bulldog" trademark. Payments for the right to use these items may be royalties. See Sierra Club, Inc. v. Commissioner, supra; Alumni Association of the Univ. of Or., Inc. v. Commissioner,

---

[4]Respondent's position is consistent with Tech. Adv. Mem. 97-24-006 (June 13, 1997), in which respondent took the position that income from an affinity credit card arrangement received by a sec. 501(c)(3) organization is unrelated business taxable income under sec. 512(a).

supra; <u>Oregon State Univ. Alumni Association, Inc. v.</u>
<u>Commissioner</u>, <u>supra</u>.

Respondent points out that MSU gave PB&T permission to use
the "walking bulldog" trademark without charging PB&T or
petitioner and contends that this means PB&T did not pay to use
it.  Respondent's contention takes MSU's permission out of
context.  When viewed in context, it is clear that MSU handled it
this way so PB&T's payments to use the "walking bulldog"
trademark would go to petitioner, not to let PB&T use the
"walking bulldog" without cost.

We conclude that PB&T paid petitioner for the right to use
valuable intangible property rights.

C.    <u>Whether PB&T's Payments Were for Services</u>

Respondent contends that PB&T paid petitioner to perform
services relating to the affinity credit card program and
contends that petitioner performed a large number of services for
PB&T.  We disagree.  Petitioner's activities were minimal and
infrequent, were not conducted like a commercial business, and
were not services for which PB&T paid.

1.    <u>Petitioner's Use of the Program for Its Exempt Purposes</u>

Respondent mischaracterizes some of petitioner's activities
as services for PB&T or credit card promotional activities.  For
example, respondent refers to the messages petitioner included in
the credit card bills as promotional materials, even though they
were used only to promote petitioner's activities to its members;

the messages were not used to promote the card. Respondent characterizes petitioner's maintenance and updating of its mailing list as a substantial service for PB&T and as administration of its affinity credit card program. We disagree; these actions are more fairly viewed as part of petitioner's communication to its members, which is central to its exempt purpose.

2. PB&T's Access to Petitioner's Intangible Property

Respondent contends that petitioner's providing its mailing list to PB&T was a service. We disagree; the mailing list was valuable intangible property. Alumni Association of the Univ. of Or., Inc. v. Commissioner, supra; Oregon State Univ. Alumni Association, Inc. v. Commissioner, supra; see also Sierra Club, Inc. v. Commissioner, T.C. Memo. 1993-199. Providing the list to PB&T was essential to PB&T's use of that property. Respondent also contends that petitioner's agreement to use its best efforts to maintain MSU's permission to use the "walking bulldog" was a service. We disagree. MSU had already decided to let PB&T use the MSU trademark for the credit card agreement. No activity by petitioner was required. Even if petitioner had to act so that PB&T could continue to use the "walking bulldog" trademark, that effort would have been undertaken to provide intangible property to PB&T, not to provide a service.

Similarly, contrary to respondent's contention, the facts that PB&T substantially agreed to the terms outlined by

petitioner's initial letter and the program generated increasing income for petitioner each year do not speak to whether the income was a royalty.

3.  Activities of MSU and PB&T

Respondent contends that the article in Alumnus written about the credit card program is an activity by petitioner.  We disagree; the article was written by the Office of University Relations, not petitioner.  Respondent points out that the article said:  "Additional information on the Bulldog Card can be obtained by calling the MSU Alumni Association * * * or The Peoples Bank", and contends that this shows petitioner was marketing the credit card program.  We disagree.  It merely means that the author was telling readers that petitioner had information about the credit card program.

Respondent contends that petitioner permitted PB&T to distribute credit card applications at a football game.  We have not so found because the record indicates that MSU, not petitioner, permitted PB&T to conduct this activity.

Respondent suggests that petitioner was involved in employing MSU students to insert credit card applications in bags at the MSU bookstore.  There is no basis in the record for respondent's suggestion.

4.  Petitioner's Marketing Coordinator

Respondent contends that petitioner's hiring of a marketing coordinator shows that the payments at issue were for services

because Grafton projected that the person hired could generate enough funds to pay his or her own salary. We disagree. It is not surprising that the marketing coordinator for a fundraising organization would raise more money than he or she was paid.

Respondent contends that Andrews regularly devoted a substantial amount of time to the credit card program. We disagree. Andrews, Grafton, and Brown testified without contradiction that Andrews worked only a negligible amount of time on the credit card program.

Andrews' effort to sell advertising for the credit card program to PB&T was not a service to PB&T; it was an effort to increase petitioner's advertising revenue. Respondent implies that the fact that Andrews suggested changes to the 1987 agreement so petitioner could get more use from the message included in the monthly billing statement and contacted other universities to seek ideas for the addendum for the 1991 contract were services for PB&T. We disagree; this was work she did to assist petitioner in its dealings with PB&T.

5. <u>Endorsement and Review of Marketing Materials</u>

Respondent points out that petitioner endorsed the program and reviewed marketing materials prepared by PB&T. Respondent contends that these actions were services to PB&T for purposes of section 512(b). We disagree.

PB&T or advertising firms hired by PB&T wrote endorsement messages over a facsimile of Grafton's signature which were

printed on petitioner's letterhead.  Petitioner did not write or pay for the letters.  Grafton spent only 3 to 5 minutes reviewing each endorsement letter, and he did not change the letters.  An organization's review of marketing materials which bear its name is reasonably related to protecting the organization's name and does not disqualify payments from being royalties.  <u>Alumni Association of the Univ. of Or., Inc. v. Commissioner</u>, <u>supra</u>; <u>Oregon State Univ. Alumni Association, Inc. v. Commissioner</u>, <u>supra</u>; <u>Sierra Club, Inc. v. Commissioner</u>, T.C. Memo. 1993-199.  The Commissioner has ruled that endorsement of products through the use of likenesses and signatures of professional athletes does not prevent payments from being royalties.  Rev. Rul. 81-178, 1981-2 C.B. 135.  That ruling discusses two situations.  The first situation is substantially like this case, in which the income from the endorsement of products, use of signatures and trademarks, and review of licensed products is a royalty.  <u>Id.</u>  The second situation involves much more activity, such as personal appearances.  The Commissioner ruled that income in that situation is not a royalty.  <u>Id.</u>

We conclude that petitioner's review of marketing material and endorsement of the program were not services to PB&T.

6.  Credit Card Application Forms

Respondent contends that petitioner helped PB&T market the affinity credit cards, that petitioner's employees "regularly" took credit card applications to chapter meetings. We have not so found because the record does not indicate how often petitioner's employees took applications to chapter meetings or how often chapters met. Petitioner had application forms available for members, took an unspecified number of application forms to some meetings with its other membership information, and mailed some in response to specific requests from members. We disagree that petitioner's actions are fairly characterized as marketing or services for PB&T, or that PB&T paid petitioner for these minimal actions. These actions are too insignificant to preclude a finding that petitioner's income from the credit card program is a royalty.

7.  Advertising

Respondent contends that Alumnus did not accept paid advertising before 1990, on the basis of the fact that Andrews and Deann Williams wrote letters which refer to the September 1990 issue of Alumnus as the first to accept paid advertising. Grafton, who, unlike Andrews, worked for petitioner before 1990, testified that Alumnus accepted paid advertising in 1988 and possibly earlier. PB&T bought a 3/4-page color advertisement featuring the person who broadcasts MSU football games in the fall 1988 issue of Alumnus and paid for artwork for the ad.

Respondent speculates that PB&T paid only petitioner's costs for advertising in Alumnus, but the record does not so indicate.

Respondent contends that petitioner and PB&T had an understanding that petitioner would participate in advertising the credit cards. This contention is at odds with the contracts between PB&T and petitioner and Grafton's and Brown's testimony that there was no unwritten understanding. Petitioner did not participate in advertising the credit cards.

8.  Mailing List With MSU Students and Faculty

Respondent contends that petitioner gathered and gave to PB&T the names and addresses of MSU faculty and the parents of MSU students, that those names were not in petitioner's data base, and that doing so was a service to PB&T. Respondent's contention is speculative and based in part on the fact that petitioner billed PB&T for 4,000 envelopes and sheets of petitioner's stationery and for 3,124 mailing labels for the MSU faculty and staff. There was no testimony about this bill. A handwritten note on it says that it was for stationery and supplies; it does not say that it was for services.

9.  Olympic Gold Coin Program

Respondent contends that petitioner's participation in the Olympic gold coin program shows that the payments from PB&T were not royalties. We disagree. PB&T received a solicitation from a vendor and offered to share with petitioner any commissions for orders it received from petitioner's members. There were no

orders. There is no evidence that petitioner did anything except receive a letter from PB&T offering to split the commissions from the program.

10. <u>Analysis and Conclusion</u>

PB&T paid petitioner for its endorsement and to use its mailing list and MSU's "walking bulldog" trademark; PB&T did not pay for services related to operating a credit card business. Petitioner's activities were almost entirely limited to (a) giving PB&T access to those intangibles, (b) achieving some direct member-related benefits such as messages on cardholder statements and indirect benefits such as increased advertising revenues for Alumnus, and (c) protecting petitioner's good will with its members such as by reviewing mailings and responding to occasional inquiries.

Respondent contends that petitioner's activities were as extensive as those of organizations that received income which was not a royalty, such as in <u>Texas Farm Bureau v. United States</u>, 53 F.3d at 125-126; <u>Fraternal Order of Police v. Commissioner</u>, 833 F.2d 717, 723-724 (7th Cir. 1987), affg. 87 T.C. 747 (1986), and <u>Louisiana Credit Union League v. United States</u>, 693 F.2d 525, 533 (5th Cir. 1982). We disagree. Petitioner's activities to support the affinity credit card program were far less substantial than the activities performed by the taxpayers in those cases.

The organization in <u>Texas Farm Bureau</u>, in addition to providing its logo, name, and mailing list, provided clerical and administrative services, telephones, office supplies, and other goods and services necessary to conduct an insurance business. <u>Texas Farm Bureau v. United States</u>, <u>supra</u> at 123-124.  In <u>Fraternal Order of Police v. Commissioner</u>, <u>supra</u>, the taxpayer published a magazine for which the taxpayer could appoint the executive editor, prepare editorials and feature articles, control solicitations of business listings and the bank account, and decide whether an article appearing in the magazine could be reprinted elsewhere.  The U.S. Court of Appeals for the Seventh Circuit held that the organization's income from business listings was commercial advertising and was not a royalty because the organization conducted it like a commercial venture.  <u>Id.</u> at 723.

The taxpayer in <u>Louisiana Credit Union League</u> dealt with commercial insurance vendors, debt collectors, and electronic data processing services for its members.  The U.S. Court of Appeals for the Fifth Circuit said that the taxpayer--

> did everything short of actually selling the insurance and collecting the debts itself: it selected the companies whose products and services would be endorsed, actively marketed and promoted those products and services to member credit unions, and performed the day-to-day administrative tasks essential to the insurance and debt collection operations.  [<u>Louisiana Credit Union League v. United States</u>, <u>supra</u> at 533.]

The U.S. Court of Appeals said that "More comprehensive involvement would be difficult to imagine." Id.  Unlike the organizations in Texas Farm Bureau v. United States, supra, Fraternal Order of Police v. Commissioner, supra, and Louisiana Credit Union League v. United States, supra, petitioner did not perform business services.  Petitioner's activities relating to the affinity credit card program were minimal.  PB&T paid petitioner to use intangible property, not to obtain business services.  As the U.S. Court of Appeals for the Ninth Circuit said:

> To hold otherwise would require us to hold that any activity on the part of the owner of intangible property to obtain a royalty, renders the payment for the use of that right UBTI and not a royalty.  [Sierra Club, Inc. v. Commissioner, 86 F.3d at 1536.]

We conclude that PB&T's payments to petitioner under the affinity credit card contracts were for the use of valuable intangible property rights, not for services.

D.    Petitioner's Use of Its Mailing List

Respondent contends that, like the taxpayer in Disabled Am. Veterans v. Commissioner, 942 F.2d 309 (6th Cir. 1991), and Disabled Am. Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178 (1981), petitioner regularly rented its mailing list. Respondent argues that, under those cases, income from petitioner's mailing lists is not a royalty.  We disagree.

In Disabled Am. Veterans v. United States, 650 F.2d at 1184, the Court of Claims held that the Disabled American Veterans

(DAV) conducted a trade or business of renting its mailing list and that it was not royalty. From 1974 to 1979, DAV rented parts of its donor list 451 times. Disabled Am. Veterans v. Commissioner, 942 F.2d at 311. In doing so, DAV followed the usual practices of the direct mail industry. Id. DAV prepared rate cards showing the rates it charged to customers. Id. DAV employed two staff personnel full time to administer its list rentals. Id. Petitioner did not use list brokers, employ anyone to administer its mailing list rental, or otherwise try to rent its mailing lists like the taxpayer in Disabled Am. Veterans v. United States, supra.

Respondent points out that the 1987 agreement ran for 3 years, and petitioner regularly received income from the program. We disagree that this fact shows that PB&T's payments to petitioner were not royalties because royalties are often paid regularly over several years. See, e.g., Kramer v. Commissioner, 80 T.C. 768 (1983); Cloward Instrument Corp. v. Commissioner, T.C. Memo. 1986-345, affd. 842 F.2d 1294 (9th Cir. 1988).

Petitioner had agreements with Wayneco in 1988, 1989, and 1991 for Wayneco to use petitioner's mailing list to sell affinity items to petitioner's members. Petitioner's agreements with Wayneco and PB&T are not remotely like DAV's list rental activity.

Respondent contends that the September 1991 letter Chuck Smith sent to petitioner shows that petitioner actively rented

its mailing lists during the years in issue. We disagree. In that letter, petitioner requested list rental rates for July 1988 to June 1989. It does not show that petitioner was renting its lists during the years in issue.

The taxpayer in Sierra Club, Inc. v. Commissioner, 86 F.3d 1526 (9th Cir. 1996), set the rental rates, rented its mailing lists, and had the right to review requests to rent the lists and to approve the proposed mailing material and schedule for each mailing, but took no other action. The U.S. Court of Appeals for the Ninth Circuit held that payments for rental of mailing lists were royalties because the taxpayer did not provide any services with the mailing lists. Id.

Petitioner's conduct was more like that of the taxpayer in Sierra Club than that in Disabled Am. Veterans. Like the taxpayer in Sierra Club, petitioner maintained its mailing lists to further its tax-exempt function. Sierra Club, Inc. v. Commissioner, 86 F.3d at 1535. Petitioner employed Carr to maintain the lists on a computer data base. Like the taxpayer in Sierra Club, petitioner set rental rates and had the right to approve mailing material, but unlike the taxpayer in both Disabled Am. Veterans cases, it did very little else to support the credit card program. PB&T prepared and mailed all of the promotional materials.

Respondent points out that petitioner reported the Wayneco payments from the sale of merchandise, such as watches and rings,

as taxable income but not its income from the affinity credit card program. Petitioner reported its income from the sale of merchandise as UBTI but treated its income from the credit cards as a royalty. The record does not show why petitioner treated the Wayneco payments and the payments at issue differently. However, the fact that petitioner did not treat the Wayneco payments and the affinity credit card program payments consistently does not deprive the payments at issue of status as a royalty.

Respondent speculates that the credit card fosters less affinity towards MSU by its members than the items for sale with the "walking bulldog" trademark because those are likely to be viewed by members more often than a credit card that is kept in a wallet. We disagree. Ward and Grafton testified without contradiction that the credit cards and the items bearing the MSU "walking bulldog" trademark encourage good will between petitioner's members and MSU; nothing in the record supports respondent's view.

E. Failure To Refer to PB&T's Payments to Petitioner as Royalties in the 1987 Agreement

Respondent contends that the payments at issue are not royalties because the 1987 agreement did not call them royalties. Respondent contends that under Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549

(1965), petitioner may not assert that payments under the 1987 agreement were royalties.

When the _Danielson_ rule applies, a taxpayer may not disavow unambiguous terms of an agreement to achieve different tax results unless mistake, undue influence, fraud, duress, or other ground exists to set aside the agreement. _Id._ at 775. _Danielson_ does not apply here because petitioner is not disavowing any terms of its agreements with PB&T. The 1987 agreement does not characterize the payments; it does not say the payments were (or were not) royalties or income from a trade or business. Petitioner's position that the payments are royalties is consistent with the 1987 agreement.

F.   Whether Section 513(h) Applies

Section 513(h) exempts from tax amounts earned by certain tax-exempt organizations from the trade or business of exchanging or renting mailing lists to other tax-exempt organizations.[5]

---

[5]Sec. 513(h) provides:

    (1) In general.--In the case of an organization which is described in section 501 and contributions to which are deductible under paragraph (2) or (3) of section 170(c), the term "unrelated trade or business" does not include--

       *   *   *   *   *   *   *

    (B) any trade or business which consists of--

       (i) exchanging with another such organization, names and addresses of

(continued...)

Section 513(h) is effective for exchanges and rentals of member lists after October 22, 1986. Respondent contends that the enactment of section 513(h) implies that renting mailing lists is generally a trade or business. Respondent asks us to infer from the enactment of section 513(h) that Congress generally views gross income from the licensing of mailing lists as UBTI, unless excepted by section 513(h). We do not draw that inference.

The inference asserted by respondent is rejected in the legislative history of section 513(h). A colloquy between Congressmen Daniel Rostenkowski (D-Ill.), Chairman of the Ways and Means Committee, and John Duncan (R-Tenn.), Ranking Republican Member of the Ways and Means Committee, occurred in the House of Representatives on the day of the adoption of the conference report accompanying the bill which included section 513(h). Chairman Rostenkowski's comments were as follows:

> I also have discussed with Congressman Duncan the issue of whether the provision of the bill which excludes certain income from unrelated trade or business income creates any inference under present law. We have reached a common understanding regarding the following specific issue:

---

[5](...continued)

> donors to (or members of) such organization, or

> (ii) renting such names and addresses to another such organization.

Tax Reform Act of 1986, Pub. L. 99-514, sec. 1601(a), 100 Stat. 2085, 2766.

The question relates to section 1601 of the bill which excludes from unrelated trade or business income revenues from the use of a tax-exempt organization's mailing list by another such organization. Section 1601 of the bill, which specifically exempts certain such revenues from the tax on unrelated business income in the future, carries no inference whatever that mailing list revenues beyond its scope or prior to its effective date should be considered taxable to an exempt organization.

132 Cong. Rec. 26208 (Sept. 25, 1986). It is at best hazardous to infer the intent of an earlier Congress from a later one. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989); United States v. Price, 361 U.S. 304, 313 (1960). See Sierra Club, Inc. v. Commissioner, 86 F.3d at 1534 n.17, where the U.S. Court of Appeals for the Ninth Circuit said it would not rely on enactment of section 513(h) to infer legislative intent of Congress in originally enacting section 512(b).

Respondent relies on a concurring opinion in Disabled Am. Veterans v. Commissioner, 942 F.2d at 317 (Martin, J., concurring), which states:

Congress, in enacting * * * [section 513(h)], obviously felt that the court of claims decision in DAV1 was the proper interpretation of "royalties" for purposes of § 512(b)(2) with respect to the payments received by an exempt organization from a commercial organization.

*    *    *    *    *    *    *

The acceptance of DAV's position that the monies it receives from list rental are royalties under § 512(b)(2) would totally eviscerate section 513(h).

We draw no inference from the enactment of section 513(h) as to whether the affinity program at issue is a trade or business.[6]

G.    Whether Royalty Treatment Is Consistent With the Purpose of the Tax on Unrelated Business Income

Respondent contends that the affinity credit card program at issue here leads to unfair competition between tax-exempt organizations and taxable businesses and that Congress intended to subject that income to the tax on unrelated business income. We disagree.

The tax on unrelated business income was enacted to prevent tax-exempt organizations from unfairly using their tax-exempt status to compete with commercial businesses. United States v. American College of Physicians, 475 U.S. 834, 837-838 (1986).

Respondent contends that petitioner's activities relating to the affinity credit card were like the insurance activities at issue in United States v. American Bar Endowment, 477 U.S. 105 (1986). In that case, the Supreme Court held that the American Bar Endowment (ABE) conducted a trade or business, creating the kind of unfair competition that led to the enactment of section 512. Id. at 114. We disagree that the facts are similar. ABE provided group insurance policies to its members. Id. at 107. ABE actively administered the insurance program. Id. ABE chose insurers, negotiated premium rates with insurers, compiled lists

---

[6]See Sierra Club, Inc. v. Commissioner, 86 F.3d at 1534 n.17.

of its members, solicited and collected premiums from its members, sent premiums to the insurer, kept files on each policyholder, answered members' questions about insurance policies, and screened claims for benefits.  Id.  The Supreme Court found that this arrangement created unfair competition because ABE's members could deduct part of their premium payment as a charitable contribution.  Unlike ABE, petitioner did not compete with any taxable entity; PB&T, not petitioner, competed with other credit card issuers.

We conclude that petitioner did not engage in any activity which Congress intended to subject to the tax on unrelated business income.

H.  Conclusion

Petitioner's income from the affinity credit card program in the years in issue is a royalty excluded by section 512(b)(2) from the unrelated business income tax.

To reflect the foregoing,

Decision will be

entered under Rule 155.